## CHAPMAN et al. v. HOPPER. (No. 2900.)

(Court of Civil Appeals of Texas. Texarkana. March 20, 1924.)

1. **Banks and banking** ⊜80(1)—**"Deposit" held to constitute loan entitling stockholder to share in assets.**

A bank stockholder's "deposit," which was voluntarily made to aid bank, and with understanding that it was returnable if bank secured a loan from government, *held* to constitute a loan making stockholder a creditor on bank's liquidation, and entitling him to share in distribution of assets applicable to his claim.

2. **Banks and banking** ⊜49(4)—**Loan to bank prior to liquidation held not applicable to discharge stockholder's liability.**

A bank stockholder *held* not entitled on bank's liquidation to have a loan, made by him to bank prior thereto, applied in satisfaction of his stockholder's liability, provided by Rev. St. 'arts. 459, 552, although it was stockholder's understanding at time of loan that it was to be so applied.

3. **Banks and banking** ⊜47(2)—**Legal assessment of stockholders made only after bank's liquidation.**

The legal assessment of stockholders, such as commissioner can make, can only be made after liquidation of bank's affairs begins.

4. **Banks and banking** ⊜49(4)—**Stockholder's payment of assessments in advance of time required by law not legal payment.**

A payment by a stockholder, as an assessment on his stock in advance of a legal assessment, is not a legal payment.

Error from District Court, Walker County; Carl T. Harper, Judge.

Action by W. O. Hopper against J. L. Chapman and others. Judgment for plaintiff, and defendants bring error. Reversed and rendered.

This suit is by the defendant in error against J. L. Chapman as state commissioner of insurance and banking, and W. A. Whitley, liquidating agent of the affairs of the Guaranty State Bank of Dodge, to enforce the payment out of the bank guaranty fund of $650 claimed by the defendant in error to be allowable as an unsecured noninterest-bearing deposit in the Dodge bank at the time its doors were closed.

The plaintiff in error filed a general denial, and specially pleaded as a defense that the $650 was not placed in the bank by the defendant in error as a general deposit to his credit, but that he paid the same into the general funds of the bank as a voluntary stockholders' assessment to repair the impaired capital stock of such bank.

The case was tried before the court without a jury, and a judgment was entered in favor of defendant in error, ordering the state commissioner to pay the sum sued for out of the state guaranty fund.

On January 6, 1922, the state commissioner of insurance and banking closed the doors and took charge of the affairs of the Guaranty State Bank of Dodge. He appointed a liquidating agent, who began collection of the assets of the bank. W. O. Hopper, the defendant in error, was the vice-president and a stockholder, as well as director, of the Guaranty State Bank of Dodge. He owned 13 shares of stock, of the par value of $100 each. "On December 12, 1921," as Mr. Hopper testified, "we had a meeting of the directors of the bank with a special agent of the banking department. Prior to that time we had negotiations with the War Finance Corporation by which we expected to obtain a loan of $10,000. In order to complete that loan we had to get out and raise some money and put it on deposit. We went over that matter with the special representative of the banking department. The understanding we had was that we would go ahead and put it on deposit and would get this other money by borrowing it from these people, and we would finance the bank right on with it. The special representative, Mr. Whitman, agreed to it, and said that in case the bank did not continue this would apply to our 100 per cent. assessment. We all knew that we would be liable for 100 per cent. assessment if we did not continue to do business. No assessment was undertaken to be levied at that time on the stock of the bank that I know of. An assessment was levied at the time the bank went into liquidation. That was 100 per cent. assessment. No amount was levied at all on this particular day when he had this conference with the special agent of the department. Pursuant to the purpose of increasing the cash in the bank, some of us increased our deposits. I went out and got money and put it on deposit. I got practically $650. I just understood that that was increasing my deposit. I knew that, if the bank failed, my stock would in any event be liable for a 100 per cent. assessment. I had something like $4,000 or $5,000 on deposit. I had 13 shares of the stock, of the par value of $100 each. After the bank went into liquidation, I made a claim against the guaranty fund for the amount of my deposit in the bank; I did that within 90 days after Mr. Randolph gave the notice. Mr. Randolph included this $650 that I had deposited there in the bank. He was liquidating agent at the time. He said that was the way he handled such matters before. When

---

⊜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

he sent the claim in he got a notice that they would not allow the $650. I got the notice that they had rejected my claim for the $650. They took out of my unsecured, noninterest-bearing deposits the 100 per cent. assessment, which was $1,300, and then this $650. They lacked that $650 of paying me what I had on deposit in the bank. I made no objection to taking out the $1,300, because I recognized that as a liability. The day I paid the $650 to the bank was the 12th day of December. The way I paid this, I gave the bank a check against my account for it. That was taken out of the deposit I had on hand that day, but I made a deposit at the same time to offset that. I was one of the directors of the bank at that time. The bank was in what you might call a hard financial shape at that time—you might call it that; but, if the plans had all worked out that we had made, there wasn't any reason that I know of for taking it over. My intention was to help the bank over by this deposit. Four of us made a deposit. I thought I was going to get my money less the 100 per cent. assessment until I got my check from the department. * * * The understanding was that in the event we got this money from the War Finance Corporation the $650 deposit was to go back to our general deposits, subject to check. That was the understanding we had at that time. This deposit of $650 was not to be drawn against until after we got this money from the War Finance Corporation, and when we got that it was to be drawn against. They were to refund our money back and let it go back subject to check. I had something like $4,000 or $5,000 in there at the time I made this agreement with the special agent. When I made this $650 deposit the idea was that I could not draw it out until after we got the money from the War Finance Corporation, and in the meantime it was my understanding that it was to go to a deposit fund to the credit of the owners—a stockholders' deposit fund. The cashier put it under "Assessment Fund," but it was not intended to be put under that fund. No matter what you call it, it was to be security for the bank for the time being, and was to help the bank, with the understanding that I was to get it back. There was nothing compulsory about it; but just a few of us made up this deposit for the benefit of the bank."

The bank's book in evidence shows that on December 12, 1921, Mr. Hopper's account was charged with $650. Mr. Whitley testified:

"That book is the general ledger, and it shows that the $650 deposited by Mr. Hopper on December 12 was made by Mr. Hopper drawing out of his individual account $650, and the $650 was credited to 'Assessment Fund' on the same day."

The ledger also shows that Mr. Hopper made additional deposits on December 12

and 19 aggregating $650, and the same was placed to his credit. This $650 was allowed by the commissioner as a proper claim, and is not in controversy.

Mr. Fitzgerald, a director of the bank, and present at the conference of December 12, 1921, testified:

"I was in Dodge on December 12, when some of us put in some additional funds in the Guaranty State Bank of Dodge. I put some in then myself. I had on deposit there at that time about $11,000. I did not use any of this money. Our idea in making this deposit was that we were trying to hold the bank up. We had been promised that, if we could build up the bank in the amount of cash, we could get a loan of $10,000. I put $250 in that day. I put it in as a deposit. We did not undertake to make any assessment against anybody. I think about three or four of us put money in there at that time. I had 5 shares of stock, of the par value of $500. My purpose in paying that $250 was to help the bank. It was to try to keep the bank going. I deposited it there with the understanding that it was to help hold the bank up. I let the bank have that to help it over an extreme."

Wm. McMurrey, of Cold Springs, for plaintiffs in error.

Dean & Humphrey, of Huntsville, for defendant in error.

LEVY, J. (after stating the facts as above). [1-4] The proposition stated in the brief of plaintiffs in error, as based on the sixth assignment of error, presents in effect the point in view, viz., that the legal effect attaching to the evidence is to deny the defendant in error allowance and payment of the claim sued for out of the guaranty fund. According to the undisputed evidence, heretofore stated, "the directors of the bank" had a conference with the special agent of the state banking department, with the view and for the purpose of increasing the bank's available funds, the bank at the time being in "a hard financial shape." The ultimate agreement reached was that a fund was to be raised for "the purpose of increasing the cash in the bank," and placed in the bank, available to it as bank funds. Each stockholder was to pay into the fund a sum of money equal to one-half of the par value of the stock held. An assessment on the stock, however, was not made nor intended to be made upon stockholders as such to discharge the stockholders' liability for debts of the bank existing at the time. For, as the defendant in error testified:

"No assessment was undertaken to be levied at that time on the stock of the bank. No amount was levied at all on this particular day when we had this conference with the special agent of the department. There was nothing compulsory about it; but just a few of us made up this deposit for the benefit of the bank."

The contribution to the fund by the stockholders was to be purely voluntary. Four of

the stockholders, including the defendant in error, contributed to the fund, each ratably according to his amount of stock aggregating one-half of the par value thereof. The fund so raised was placed in the bank, and made available to it as money actually on deposit to meet its financial straits in its regular and active business. The money so paid into the fund and placed to the credit of the bank was, as testified, in order "to be security for the bank," and "for the benefit of the bank," and "to help hold the bank up." The fund was made up and placed in the bank "for the benefit of the bank," with the understanding at the time that each contributor to the same was to be repaid his contribution, "in the event we got the money from the War Finance Corporation" by way of the loan then being negotiated. The evidence is:

"The understanding was that in the event we got this money from the War Finance Corporation the $650 deposit was to go back to our general deposits subject to check."

There was further understanding, however, that in the event the bank did not get the loan from the War Finance Corporation, and "did not continue" to operate as a banking institution, that the amount each contributor put in the fund "would apply to our 100 per cent. assessment" authorized to be made by law, upon liquidation. It is evident from these precise facts that the defendant in error and his costockholders did not make nor intend to make merely an ordinary deposit of the several sums of money to their individual credit. The parties were getting up money to place to the bank's credit to be available to it in its regular business, needed to meet the bank's financial straits. And neither was the money so assembled by such stockholders intended to be a special deposit fund to their credit. The identical money constituting the fund was not to be safely kept by the bank and then returned to the stockholders at the end of a fixed time. The money was, and was intended to be, commingled with other money in the bank, and the bank was to use it in its general business, and was not to repay or "refund" it until the loan was obtained from the War Finance Corporation, whether that time be 30 days or several months. The transaction assumes, we think, all the characteristics of a loan voluntarily made to the bank as such in its corporate existence, and should be so characterized, constituting the defendant in error and each of his costockholders merely creditors of the bank at the time of its liquidation on January 6, 1922, entitling them to share in the distribution of the assets of the estate applicable to their claim. Even though the money was placed in the bank temporarily for "the benefit of the bank" and "as security" for the bank "to help it over an extreme" financial strait, the transaction is none the less a distinct loan to the bank as such of that much money for a fixed time, payable at the fixed time, and subjecting the bank to that degree of responsibility. For such parties in providing the fund, ratably contributing thereto, were acting in the transaction, not for their individual benefit, but for the benefit of the bank as a corporate institution, to the end that the bank might have actual control and use of the money during the time for the purpose intended as available cash on deposit to meet the emergency need of it. And being officers of the bank they have the power and authority to act for the bank in providing the money needed for its use in the scope of its regular business. Further, the defendant in error is not legally entitled to have the $650 paid by him into the fund, loaned to the bank, applied in part satisfaction and extinguishment of his individual responsibility of stockholder provided by articles 459, 552, Rev. Stat., even though he and his costockholders understood and believed that it would so be done, in the event of the future liquidation. The payment made into the fund by the defendant in error in conjunction with his costockholders was not made upon that distinct consideration that it was to be kept and used only after liquidation in payment of the bank's debts. The contribution he made to the fund was purely voluntary, with the opportunity and means of knowledge of the actual fact that it was not an assessment by the stockholders by their vote as such as a payment of their individual liability under the law. Neither was it actually or by intention a legal assessment by the state commissioner. The legal assessment of stockholders, such as the commissioner could make, can only be made after the liquidation of the bank's affairs begins. And payment by a stockholder as an assessment on his stock in advance of the time of a legal assessment is not, in law, a legal payment of his assessment, extinguishing his legal liability to the extent of such payment. Delano v. Butler, 118 U. S. 634, 7 Sup. Ct. 39, 30 L. Ed. 260. Quoting from that case:

"The assessment * * * made by authority of the comptroller of the currency is not voluntary, and can be applied only to the satisfaction of the creditors equally and ratably. If the claim in the present case were allowed, it would follow that in every case payments made by stockholders, for the purpose of restoring the impaired capital, would be considered as credits on the ultimate * * * responsibility of shareholders, and the whole efficiency of the provisions of section 5151 for the protection of the creditors of the company at the time of liquidation would be destroyed."

The very purpose of the statute, in authorizing assessment of stockholders to pay the bank's debts, is to insure that money being in the possession of the commissioner to discharge such debts. To permit stockhold-

ers to pay assessments in advance, primarily as a loan to the bank, of the time the legal assessment is due and payable, and while the bank is continuing in business before liquidation, would utterly defeat the purpose of the statute. In such circumstances the bank could use and pay out such money in its regular business, and at date of liquidation have none of it with which to pay debts. It is not the purpose of the law to allow that condition to arise.

The judgment, we think, should be reversed, and judgment here entered in favor of the plaintiffs in error without prejudice to defendant in error's right, as a general creditor of the bank, to have his claim allowed and share in the assets of the estate applicable thereto. The defendant in error will pay costs of the trial court and of this appeal.